**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MARYLAND**
*Southern Division*

CLARENCE HENRY MORRIS,       *

    Plaintiff,                *

v.                           *        **Case No.: GJH-18-2973**

BARDON, INC. D/B/A          *
AGGREGATE INDUSTRIES, *et al.*,
                          *

    Defendants.
                          *

\*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*    \*

## MEMORANDUM OPINION

Plaintiff Clarence Morris brings this action against his former employer, Defendant Bardon, Inc., a building materials manufacturer, alleging that it interfered with his right to take medical leave under the Family and Medical Leave Act of 1993, 29 U.S.C. § 2601 *et seq.* ("FMLA"), and terminated him in unlawful retaliation for exercising that right. Bardon, a subsidiary of Defendant LaFarge North America, Inc., which in 2015 merged with Defendant Holcim (US), Inc. (together, "Defendants"), moves for summary judgment on both of Plaintiff's claims. ECF No. 20. No hearing is necessary. *See* Loc. R. 105.6 (D. Md.). For the following reasons, Defendants' Motion for Summary Judgment will be granted.

## I.    BACKGROUND[1]

Defendants are producers of concrete and other building materials and maintain production plants in Maryland cities including Frederick, Rockville, Jessup, and Beltsville. ECF

---

[1] These facts are either undisputed or viewed in the light most favorable to Plaintiff as the non-moving party.

No. 20-4 at 7, 10–11, 22, 32.[2] Plaintiff was hired by Defendants as a ready-mix concrete truck driver at the Rockville plant in 2012 and held that position until August of 2014. *Id.* at 4–5. Plaintiff averaged 60 hours per week in that role, which involved making three to six concrete deliveries per day, managing his job tickets, recording his time and mileage, and washing his truck and maintaining its "chutes." *Id.* at 41. Plaintiff was a member of the union for concrete workers at this time and remained in the union until an unspecified time in 2014. *Id.* at 21, 45.

In 2014, Plaintiff successfully applied for a new, more senior position as a delivery expediter. *Id.* at 5–6; ECF No. 20-5 ¶ 3. In that role, Plaintiff traveled to and inspected four to ten job sites per day and examined conditions to ensure that workers at each site were safe, that the site was ready for concrete deliveries, and that trucks could enter and exit safely and had an area for "wash-out" after deliveries were complete. ECF No. 20-4 at 5. Plaintiff would also prepare accident reports and speak with customers or residents about issues that arose and would take pictures of job sites and any issues he noticed to share with Defendants' dispatch office, plant managers, and sales staff. *Id.* at 7. Plaintiff was one of two delivery expediters employed by Defendants at this time, both of whom were issued pickup trucks, laptops, and phones. *Id.* at 6–7. In the average week, Plaintiff worked 45 to 55 hours in the delivery expediter role. *Id.* at 10.

At some point during his time as a delivery expediter, Plaintiff was diagnosed with prostate cancer, for which he took multiple periods of FMLA leave. *Id.* at 27. Plaintiff testified that he believed he was first diagnosed in 2015, *id.* at 27, though according to Defendants' records of Plaintiff's leave requests, Plaintiff first took FMLA leave from October 22, 2014 through December 19, 2014, ECF No. 20-6 at 3. In any case, Plaintiff next took leave from September 14, 2015 through October 15, 2015. *Id.* at 3. Plaintiff took a third leave period from

---

[2] Pin cites to documents filed on the Court's electronic filing system (CM/ECF) refer to the page numbers generated by that system.

February 19, 2016 through April 1, 2016. *Id.* at 2–3; ECF No. 20-4 at 6. Plaintiff needed this time off to treat side effects of a radiation seed implant. ECF No. 20-4 at 6.

The week before he was due to return, an employee in Defendants' dispatch office, Brian Murphy, called Plaintiff and told him that his position was being eliminated. *Id.* at 6–7. According to Defendants' Regional Human Resources Manager Terri Collins, Plaintiff's position was one of several that were eliminated as redundant after Defendant LaFarge North America, Inc. merged with Defendant Holcim (US), Inc. on July 15, 2015. ECF No. 20-5 ¶ 4; ECF No. 20-9 at 6. Plaintiff was aware that the merger was happening but did not know when or if it had happened at the time he returned from leave, nor was he aware of any other positions being eliminated besides his. ECF No. 20-4 at 6. When asked if he thought that there was an ulterior motive for the elimination of his position, Plaintiff responded "I don't know why they eliminated my position." *Id.* at 7.

At the same time that he informed Plaintiff that Plaintiff's delivery expediter position was being eliminated, Murphy told Plaintiff that an employee in the role of "batcher" at the Rockville plant was resigning and that Murphy would like Plaintiff to temporarily try filling the position, which is also known as a plant operator. *Id.* at 7–8. Plaintiff agreed, reported to the plant after his FMLA leave was complete, and participated in two weeks of training for the position. *Id.* at 8. On April 15, 2016, Collins sent a letter to Plaintiff confirming that Defendants had formally offered Plaintiff the position of "Batcher/Plant Operator" at the Rockville plant, that Plaintiff had accepted, and that the effective date of his transfer would be April 18, 2016. ECF No. 20-7 at 2.[3]

Though Plaintiff accepted the new role, he was upset because he did not also receive an annual raise to which he believed he was entitled. ECF No. 20-4 at 8. According to Plaintiff,

---

[3] Collins' surname was Coomaraswamy at this time. ECF No. 20-7 at 2; ECF No. 26-1 at 7.

Defendants granted between a 2 and 4 percent raise every April and he was entitled to one on April 1, 2016. *Id.* at 9. In her April 15 letter to Plaintiff, Collins explained that Plaintiff's "existing hourly rate is in alignment with that of others holding the same role, so there will be no adjustment to your hourly rate at this time." ECF No. 20-7 at 2. In an affidavit, Collins testified that Plaintiff's expected wage increase was "entirely discretionary and not guaranteed, regardless of whether his position was eliminated or whether he was out on leave." ECF No. 20-5 ¶ 11. Collins further stated that Plaintiff's wage as a batcher/plant operator "was already in alignment with, and in some cases higher than, that of other employees in the same position, so we did not find it necessary to increase his salary." *Id.* ¶ 12. Plaintiff mildly disputed that assertion in his deposition, stating a belief that other plant operators received raises and that he was not paid more than other batcher/plant operators at his existing rate. ECF No. 20-4 at 9–10.

Plaintiff's new position as batcher/plant operator had more duties and required more hours than his previous position. *Id.* at 10. Plaintiff's responsibilities included loading trucks, ordering inventory, which included cements, stone, sand, gravel, and other materials, completing checklists and "measur[ing] everything around the plant," conducting inspections before and after deliveries, overseeing the treating of excess water to comply with environmental rules, and conducting safety meetings. *Id.* at 10–11. Plaintiff also supervised and dispatched truck drivers and oversaw maintenance when needed. *Id.* at 39–40. According to Plaintiff, he worked 60 to 80 hours per week in the batcher/plant operator role. *Id.* at 40.

At his deposition, Plaintiff testified that two to three employees typically shared the duties he was assigned and that they were excessive for one person, particularly because the Rockville plant was the busiest of Defendants' facilities. *Id.* at 10–12. Plaintiff repeatedly raised this issue with his supervisor, area manager Kevin Pepple, who told Plaintiff that the company

was trying to get him help. *Id.* at 11–12. While no one was ever permanently assigned to such a role, an employee was assigned on a temporary basis "at one point," and Plaintiff "had help here and there." *Id.* at 11–12. When asked if he had reason to believe that Defendants were intentionally not providing him with help, Plaintiff responded "I don't know," though he speculated that "it seemed to be that way." *Id.* at 12. Plaintiff also asserted that after he eventually left the role, drivers at the Rockville plant with whom he had worked told him that two to three employees had begun sharing his former duties. *Id.* at 12–13.

Plaintiff remained in the position through 2016 and part of 2017, though he applied for three other positions for which he was not selected either because union members were given preference or because he applied late and lacked the necessary skills and experience. ECF No. 20-4 at 21, 45; ECF No. 20-8 at 2; ECF No. 20-5 ¶¶ 6–7; ECF No. 20-9 at 5. In the early morning of July 24, 2017, Plaintiff emailed Brandon Echard, who managed all of Defendants' plants, to alert him that there was a lump in a concrete silo that was "weighing very slow" and that Plaintiff was unable to reach anyone who could help. ECF No. 20-10 at 3; ECF No. 20-4 at 22. Echard responded 11 minutes later, reminding Plaintiff that he was on vacation but nonetheless suggesting several possible solutions. ECF No. 20-10 at 3; ECF No. 20-4 at 22. Echard asked Plaintiff to "Check all of this and let me know then I can send someone over if need be." ECF No. 20-10 at 3; ECF No. 20-4 at 22. 93 minutes later, Plaintiff responded, writing "Brandon I should have a plant guy here period. Next time I'll shut down." ECF No. 20-2 at 2; ECF No. 20-4 at 22.

Asked to explain that statement at his deposition, Plaintiff stated that he had already tried the solutions Echard suggested and that "[i]t was frustrating" that no plant mechanic was on site because thirty drivers were waiting for concrete for deliveries. ECF No. 20-4 at 22–23. Plaintiff

noted that the plant "was already shut down because the silo was broke." *Id.* at 22; ECF No. 26-1 at 5. Echard responded 11 minutes after Plaintiff's email, asking "[i]sn't your plant being fixed by a maintenance guy right now?" ECF No. 20-10 at 2. Echard further stated that "to make an accusation like this and demands is completely unacceptable," and directed Plaintiff to "evaluate the situations BEFORE you send these threats out and demands, this is not how we run a business and this is completely unprofessional." *Id.* Plaintiff responded shortly after, writing "Sorry, I worked 80 hours 9 consecutive weeks so I feel . I [sic] may not make it through the day." *Id.* Asked to explain what he meant, Plaintiff testified "I'm not sure. I was working a lot." ECF No. 20-4 at 23.

The following day, July 25, 2017, Plaintiff was approved for and took FMLA leave through August 6, 2017. ECF No. 20-6 at 2. The day before his return, Plaintiff sent a text message to Pepple stating "FYI, tomorrow will not be pretty. Matter of fact I hope Cedric is there and I will be contacting Sharon Hogan and Cedric if he's not there for certain reasons. I am not looking to lose my job but I stand up for myself no matter the weather. Scared say you scared." ECF No. 20-11; ECF No. 26-1 at 2–3. At his deposition, Plaintiff testified that "Cedric" was a senior executive of Defendants while Sharon Hogan was "in charge" of environmental compliance. ECF No. 26-1 at 2. Asked to explain the message, Plaintiff testified that "it wasn't a threat" and that he was merely alerting Pepple that Plaintiff "needed to notify somebody about the issue I had with my silos and it was an EPA concern. Yes, I was going to tell Cedric and Sharon." *Id.* at 3. Asked why he would say "tomorrow won't be pretty," Plaintiff testified "I don't know" and that "I was mad," though he clarified that "I wasn't threatening no one." *Id.*

In response to the message, Pepple stated that it was Plaintiff's decision whether to speak to Cedric but that Pepple was not sure what Plaintiff meant about losing his job or "[s]cared say

you scared," and recommended that Plaintiff speak with Collins about his concerns. ECF No. 20-11 at 2. When Plaintiff returned to work the following day, he was placed on restricted duty at an office in Greenbelt, Maryland, where he was supervised by Operational Safety Support Specialist Michele Hasenbank. ECF No. 20-4 at 18, 23; ECF No. 20-5 ¶ 9; ECF No. 20-9 at 2. Plaintiff was moved to Greenbelt because the facility required navigating fewer steps to arrive at his work location. ECF No. 20-5 ¶ 10.[4]

On September 15, 2017, Plaintiff sent an email to Pepple asking that he speak with Hasenbank "in reference to treating people equally." ECF No. 20-12 at 3. Plaintiff explained that another employee was also working on restricted duty at the Greenbelt office and was allowed to work "from 6:30 to 3:00" but that Hasenbank required Plaintiff to work from "9 to 5." *Id.* Plaintiff also stated that the other worker, Kenny Gross, was allowed to complete online training modules through a program called Convergence, while Plaintiff was told that he had to "wait until I return to full duty" to perform his own Convergence training. *Id.* at 2–3; *see* ECF No. 20-4 at 23; ECF No. 20-9 at 3. Plaintiff finally informed Pepple that he was "thinking about [filing] a complaint with the EEOC on [Hasenbank] to get her attention." ECF No. 20-12 at 3.

Plaintiff addressed each of these subjects at his deposition. With respect to Gross, Plaintiff testified that he did not know why Gross was on restricted duty or what his restrictions were. ECF No. 20-4 at 24. Plaintiff believed that he and Gross were working in the same department and that Hasenbank was also Gross's supervisor. *Id.* at 24–26. In a letter to Plaintiff dated September 22, 2017, which followed a conversation the previous day, Collins informed

---

[4] The accommodation was apparently motivated by an incident on June 30, 2016 when Plaintiff fell down a set of concrete stairs at the Rockville plant after missing a step and hit his knee, his elbow, and his side. ECF No. 20-4 at 13–14. At his deposition, Plaintiff attributed the fall to fatigue, *id.* at 13, but told Pepple in an interview immediately after the incident that that he had failed to use the staircase's handrail because it was dirty and broken and the goggles he was using had obstructed his view, *id.* Plaintiff conceded that maintaining the handrail would have been within his job duties in his role as batcher/plant operator. *Id.* at 13.

Plaintiff that Gross "reports directly to a different department and supervisor, and as such, has different job responsibilities and working hours." ECF No. 20-9 at 2. "In your restricted duty role," Collins explained to Plaintiff, "you report directly to Ms. Hasenbank, and although you may have completed some duties in support of the credit/billing department, that is not your sole job function." *Id.* Asked at his deposition to respond, Plaintiff stated "I don't get it" and explained that he continued to believe that he and Gross were performing similar work. *Id.* at 25.

Collins' letter further explained that Gross was permitted to complete Convergence training modules during his restricted duty, while Plaintiff's request to do so was denied, because Gross was a driver and had fewer modules to review, whereas Plaintiff as a batcher/plant operator had several more that would take considerably more time to complete. ECF No. 20-9 at 3. For that reason, Collins explained, when Hasenbank asked Pepple about Plaintiff's request, Pepple instructed Hasenbank "not to worry" about Plaintiff's Convergence training because he would have time to complete it upon his return to full duty. *Id.* Collins further noted that there was only one laptop computer equipped with Convergence software at the Greenbelt office and that it would not have been practical to request that another one be set up because it was unlikely that the request would be fulfilled before Plaintiff returned to full duty. *Id.* At his deposition, Plaintiff stated a belief that he and Gross could have shared the laptop. ECF No. 20-4 at 25–26.

Finally, with respect to Plaintiff's hours, Collins explained that "[w]orking hours while on restricted duty are dictated by the needs of the department, and are typically scheduled around the working hours of the immediate supervisor to ensure that the employee has proper direction regarding daily job responsibilities." ECF No. 20-9 at 2. Collins noted that Plaintiff's hours "were discussed previously with Ms. Hasenbank in my presence during your second day on restricted duty in Greenbelt," at which time "you agreed to the 9:00 a.m. to 5:00 p.m. schedule."

*Id.* Collins reminded Plaintiff that "the schedule was later adjusted from 8:30 a.m. to 4:30 p.m., based on your request." *Id.* Plaintiff confirmed at his deposition that he requested a schedule change during his light duty and that it was approved. ECF No. 20-4 at 26.

In addition to addressing the "unequal treatment" concerns that Plaintiff had raised with Pepple, Collins also informed Plaintiff that he had been overheard by a human resources staff member complaining about Defendants as employers in the break room of the Greenbelt office. ECF No. 20-9 at 3. The person to whom Plaintiff was speaking also reported the comments. *Id.* Collins warned Plaintiff that "bad mouthing other employees at the Company to whomever is around you is not constructive, destroys morale, and could potentially lead to legal action against you and the Company." *Id.* Collins reminded Plaintiff that she had previously spoken with him about finding a more constructive way to voice his concerns. *Id.* She also noted, however, that since that time, several employees had approached Plaintiff's supervisors and others to discuss negative comments Plaintiff had made regarding Defendants, their procedures, and actions taken by supervisors that Plaintiff considered to be unfair treatment. *Id.* At his deposition, Plaintiff denied having made these comments and testified that after Collins' letter, Plaintiff "encouraged drivers to stay with the company." ECF No. 20-4 at 26–27.

Plaintiff returned to full duty as batcher/plant operator at the Rockville plant following his restricted duty in Greenbelt. ECF No. 20-4 at 18. Plaintiff then took a qualifying test to obtain a Maryland State Concrete Plant Technician Certification, but failed by one point. *Id.* at 20. On October 30, 2017, Greg Sessa, an Operations Manager senior to Pepple, sent Plaintiff a letter to address "performance concerns" and "noted deficiencies with regards to your conduct, professionalism and performance." ECF No. 20-13 at 2. Sessa first explained that Defendants had worked with Plaintiff for eighteen months and paid for materials to help him build the

knowledge needed for his technician certification, a credential Sessa stated was necessary for batcher/plant operators to oversee testing and preparation of materials for Maryland state concrete projects. *Id.* Sessa explained that the certification is a "regular requirement" for the Rockville plant and that Plaintiff's failure to obtain it "highlights a concern and an issue with meeting the minimum requirements for the role." *Id.* Sessa thus imposed a deadline of December 31, 2017 by which Plaintiff was required to obtain his certification to remain in his position. *Id.*

Sessa also raised Plaintiff's July 24, 2017 emails with Brandon Echard concerning the lump in the plant's silo. *Id.* Sessa informed Plaintiff that his "communication with the regional plant maintenance manager was unprofessional and inappropriate as you attempted to dictate staffing requirements, threatened to shut the entire plant down, and then threatened to leave. Your actions were not aligned with company expectations." *Id.* Sessa further noted that "the company has received multiple reports of negative and inappropriate comments being made by you and in the presence of fellow employees. . . . [Your] conduct, communication and professionalism must improve." *Id.* at 2–3. The letter closed by reminding Plaintiff of his duties as batcher/plant operator and the expectation that he "work in a productive and cost effective manner at all time." *Id.* at 3. Plaintiff was required to sign the letter. *Id.*

Plaintiff testified that when he received and signed the letter from Sessa, he "didn't think of it as a warning letter" and "didn't think nothing much of it." ECF No. 20-4 at 29. He also noted that he did not know why Sessa was again bringing up the July 24 email. *Id.* With respect to the certification test, Plaintiff testified that he had failed twice previously and that the test would not be administered again before Sessa's deadline, which Plaintiff believed Sessa knew. ECF No. 20-4 at 20, 29. Plaintiff thus thought that "he wanted me out of the position maybe." *Id.* at 29. Separately, on the day of Sessa's letter and the following day, Plaintiff applied 55 "tickets"

to the wrong purchase order in Defendants' inventory management system. ECF No. 20-14 at 2; ECF No. 20-4 at 29–30. Pepple prepared a "coaching capture form" reporting the incident on November 1, 2017, which Plaintiff signed the same day. ECF No. 20-14 at 2. Plaintiff testified that Pepple and other workers had made similar mistakes and that he took steps to correct the issue when he noticed it. ECF No. 20-4 at 30.

As a result of the deadline Sessa had imposed for Plaintiff to remain in his position without the certification, Plaintiff requested that he be transferred back to a driver position. *Id.* at 20–21, 29. Plaintiff's request was granted in November 2017 and he was transferred to a driver role at Defendants' facility in Jessup, Maryland, which was 25 to 30 miles from his home in Rockville and where he had not worked previously. *Id.* at 21. Plaintiff had asked to work at the Rockville facility, but was told by Pepple that he could not "because it was union." *Id.* At the Jessup plant, Plaintiff was supervised by Jonathan Mannon and Scott Hanks, the area manager, and averaged 45 hours of work per week. *Id.* at 21, 41. Upon arriving, Plaintiff spoke with Mannon and Hanks and asked to be transferred back to the Rockville plant to work as a driver there. *Id.* at 31–32. According to Plaintiff, Hanks told him that he would be transferred after more drivers were hired for the Jessup plant during the following spring. *Id.* at 32.[5]

Between January 11, 2018 and February 12, 2018, Plaintiff "called out" of work five times and scheduled two days of unpaid leave. ECF No. 20-15 at 2. On February 13, 2018, Plaintiff was issued a disciplinary notice stating that while documentation excusing some of the absences had been turned in, "five in the first thirty days is excessive." ECF No. 20-15 at 2. The warning further stated that "[p]art your responsibility is to make appointments far enough in

---

[5] Plaintiff had previously sought to transfer to an open driver position at the Rockville plant in February 2017. ECF No. 20-4 at 45; ECF No. 20-8 at 2. Plaintiff understood, however, that Defendants were required to give preference for the position to members of the union, to which Plaintiff did not belong at that time. ECF No. 20-4 at 21, 45.

advance to allow dispatch to better plan, use short term disability and or Family Emergency Levee [sic] if necessary." *Id.* Plaintiff testified that while he might have taken off one of the five days for non-medical reasons, he was certain that the others were for medical treatment. ECF No. 20-4 at 30–31. According to Plaintiff, on January 25, 2018, he called in sick after noticing blood in his urine, went to a doctor that day, and emailed a note to his supervisor saying that he would also be out the following day for a urologist visit, for which he also submitted a note. *Id.* at 30–31. The remaining two absences were for scheduled procedures for which he requested time off without pay in advance. *Id.* at 31. Though his testimony is somewhat unclear, Plaintiff appeared to state that he sought time off without pay because he did not want to use FMLA leave. *Id.*

On April 6, 2018, Plaintiff walked into the "mechanic shop" at the Jessup facility to get oil for his truck and observed Mannon having a conversation with another employee, Curtis King. ECF No. 20-17 at 2; ECF No. 20-4 at 32–33. Plaintiff testified that he could not hear what they were saying but that while he was "going about [his] business" in the mechanic shop, Mannon approached him and said "Clarence, I'm not calling you a Coon." ECF No. 20-4 at 33; ECF No. 20-17 at 2. Plaintiff asked Mannon what he was talking about, but King and Mannon continued their conversation, in which Mannon said that he had "buddies in the military" who "called black people Coons." ECF No. 20-4 at 33; ECF No. 20-17 at 2. King responded "man, I call black people black people," and repeated that statement three times as Mannon continued his conversation with King. ECF No. 20-4 at 33. Plaintiff then left the mechanic shop. *Id.*

On April 29, 2018, Plaintiff sent a text message to Mannon and Mannon's supervisor, dispatcher Jeff Bellamy. *Id.* at 16; ECF No. 20-16 at 2. The message stated: "Hi John, you approved a personal day for tomorrow but I am on the schedule. Please let Jeff know what possible [sic], see you on Tuesday." ECF No. 20-16 at 2. Mannon responded "Hi Clarence you

just did. Either text just me or just text Jeff. However texting me and Jeff at the same time it is both asinine and just plain skulduggery [sic]. Secondly I preferred Jonathan if you have to shorten it I prefer Jon. Thanks I will see you Tuesday. Jeff sorry you had to be involved in this." *Id.* Plaintiff responded "I attached Jeff to let him know I wouldn't be in, I just wanted you to verify that since you didn't submit the request form to dispatch. This is the second time you called me out of my name and I think I need to take this to HR. I was just communicating so we'd all be on the same page. Secondly I know Jeff doesn't have a problem with me communicating this info. We have communicated more than one Sunday over the years. I will be contacting Scott Hanks about this matter." *Id.* at 3.[6]

On May 3, 2018, Plaintiff filed a written complaint raising several incidents that had occurred over the prior few months, including his warning in February for his absences, the incident with Mannon and King in the mechanic shop on April 6, and his text exchange with Mannon and Bellamy on April 29. ECF No. 20-17 at 2. Plaintiff also noted an additional incident on April 9, 2018 in which Mannon had called him while he was washing his truck at a job site and told him to return, after which Mannon sent Plaintiff home early. *Id.* Plaintiff also asserted that later that month, another employee named Nick told Plaintiff that Mannon said to Nick while Plaintiff was on vacation that Mannon hoped Plaintiff did not come back. *Id.* Finally, Plaintiff stated that he had requested a transfer shortly after his leave in February and that while he was told that it would be granted after two drivers were hired, the drivers were now in place but he had not been transferred. *Id.* In his deposition, Plaintiff testified that the new drivers were hired in February and that Hanks had told Plaintiff that once they were trained, Plaintiff could be transferred to Rockville. ECF No. 20-4 at 32. When Plaintiff spoke with Hanks again, Plaintiff

---

[6] The exchange continued with further discussion about Mannon's preference that Plaintiff call him Jonathan. ECF No. 20-16 at 3–4.

testified, Hanks told him that the Jessup facility had just "picked up this big job" but "we're going to get you up there." *Id.*

On May 21, 2018, Plaintiff aggravated a back injury when "lifting chutes" on his truck "to clean out the concrete," and began a period of FMLA leave that lasted until July 24, 2018. *Id.* at 19; *see also id. at* 39, 41–42; ECF No. 20-18 at 3; ECF No. 20-6 at 2. Plaintiff described the circumstances of the injury at his deposition, explaining that when a truck has leftover concrete after a delivery it must be dumped at a location at Defendants' facilities and the driver must then clean the truck. ECF No. 20-4 at 39. When plaintiff awkwardly lifted one of the two "extension chutes" on his truck to begin this process, he "reaggravated [a] lower back" injury. *Id.* Plaintiff immediately informed Mannon and was sent to a medical office for treatment. *Id.*

On June 1, 2018, Collins responded to Plaintiff's written complaint with an email that addressed the issues Plaintiff had raised. ECF No. 20-19 at 2. With respect to the April 6 incident in the mechanic shop, Collins stated that the human resources department had conducted an investigation and concluded that Mannon and King were referring to raccoon hunting and that Mannon felt a need to explain to Plaintiff that he was not referring to Plaintiff when using the term "Coon" so that Plaintiff would not be offended. *Id.* Collins concluded that the incident was a misunderstanding and that the matter would be considered closed. *Id.* Discussing the April 29 text exchange, Collins agreed that Mannon's message characterizing Plaintiff's request as asinine or skullduggery was "unprofessional" and explained that Mannon was warned about consequences for failure to adhere to proper standards of behavior. *Id.* With respect to Plaintiff's transfer requests to his supervisors at the Jessup facility, Collins stated that "[t]he Company schedules transfers based on business need." *Id.*

Finally, Collins addressed Plaintiff's "absenteeism," and explained that employees who take approved family and medical leave, which she referred to as "FML," have a responsibility to inform their supervisors in advance of scheduled appointments so that the time may be properly allocated toward that type of leave. *Id.* Collins further cautioned Plaintiff that approval for family and medical leave does not mean that all subsequent absences, whether medical or otherwise, are approved. *Id.* Collins explained that to be counted as family and medical leave, employees must report planned absences in advance and they must relate to the condition for which the leave was initially approved. *Id.* Plaintiff's disciplinary letter, Collins clarified, "did not have anything to do with approved FML, but rather was for frequent, unplanned absences which were not reported as FML-related." *Id.* Collins underscored that Plaintiff's area manager "deemed this corrective action to be appropriate as you have had frequent unplanned or unapproved absences," which were "separate and apart from any FML absence." *Id.*

When Plaintiff was released to full duty after his back injury and reported to work on July 24, 2018, Collins informed him that he was suspended pending an investigation. ECF No. 20-4 at 41–42; ECF No. 26-2 ¶ 1. Plaintiff was allowed to return on August 3 and was told that he would be paid for the days he was suspended, but was not told the reason for the investigation or its results. ECF No. 20-4 at 42; ECF No. 26-2 ¶¶ 2–3. In a response to Plaintiff's interrogatories, Defendants stated that Plaintiff was suspended "pending an investigation into discrepancies regarding his report of a workplace injury and his need for FMLA leave." ECF No. 20-18 at 4. In an affidavit, Plaintiff stated that he first learned of the reason for the suspension from that interrogatory response. ECF No. 26-2 ¶ 4.

On August 14, 2018, Plaintiff was suspended again for a remark he made to Mannon over Defendants' radio system. ECF No. 20-4 at 34; ECF No. 20-20 at 2. Mannon had called

Plaintiff over the radio and requested that Plaintiff and another driver finish washing out their trucks at a job site and return to the plant. ECF No. 20-4 at 34; ECF No. 20-20 at 2. Plaintiff responded by saying either "well, you can come out here and drive it," or "would you like to come out here and drive it." ECF No. 20-4 at 34; ECF No. 20-20 at 2. Plaintiff offered context for the remark at his deposition, asserting that his truck was blocked in at the job site and that he had previously explained that to Mannon. ECF No. 20-4 at 34–35.

Plaintiff also testified that while other drivers regularly made similar remarks to Mannon because he lacked a commercial driver's license and was unable to drive concrete trucks, to Plaintiff's knowledge none of these other drivers had been disciplined. *Id.* at 34–35, 37, 42. Plaintiff also suggested that he was joking and did not feel that his remark was insubordinate because he had no ill will in making it. *Id.* at 35, 37, 44. Because other drivers made similar statements to Mannon and said "all kinds of stuff on the radio," including "much worse," Plaintiff felt that Mannon "singled [him] out" for suspension and that Mannon was "treating [him] differently because of the complaint [he] filed and everybody knew it." *Id.* at 36.

In a suspension notice that Mannon prepared, Mannon informed Plaintiff that his remark was "uncalled for and unprofessional." ECF No. 20-20 at 2. Mannon further wrote that "[t]his is a further demonstration of unsatisfactory job performance, conduct, communication and professionalism," and that "[d]espite previously communicated concerns with your performance you have not demonstrated satisfactory levels of improvement." *Id.* Later that day, Plaintiff emailed Collins to ask how long his suspension would be. ECF No. 20-21. Plaintiff stated that "[t]his is clearly retaliation from the complaint I filed on Johanathan [sic] earlier this year" and asked Collins to "have dispatch pull my 4 delivery times on this job and you will clearly see that

my round trip times were the same as other drivers on this job if not better." *Id.* Plaintiff also again stated his belief that he was "singled out." *Id.*

The following day, August 15, 2018, Collins sent Plaintiff a letter terminating his employment. ECF No. 20-22 at 2–3. The letter explained that the action was taken "because you exhibited insubordinate and unprofessional behavior towards your Supervisor on August 14, 2018, following repeated verbal and written warnings regarding this kind of behavior." *Id.* at 2. The letter recounted that Plaintiff said to Mannon "'The truck is sitting right here. You can come get it and drive up there.'" *Id.* Collins wrote that "[t]his statement was both unprofessional and insubordinate, and is not the only time you have responded in such a manner to your Supervisor's request." *Id.*

Collins also noted an incident in May 2018 in which "your Supervisor noticed . . . that you had been sitting idle and reached out to you via radio to ask that you return to the yard . . . [and] [y]our response was, 'Slave days are over,' which is also inappropriate and unprofessional." *Id.* Plaintiff denied making that remark at his deposition and testified that "I don't know why they would say I said that" and that he received no verbal warning for the alleged statement at the time. ECF No. 20-4 at 42; ECF No. 26-1 at 7. Collins finally noted Plaintiff's July 24, 2017 emails regarding the maintenance issue at the Rockville plant. ECF No. 20-22 at 2. Collins stated that Plaintiff's emails were "dictating staff requirements and threatening to shut the plant down and leave," which was "behavior [that] was insubordinate and was not the first instance in which you had behaved in such a manner towards your co-workers." *Id.* at 2.

At his deposition, Plaintiff testified that he believed the true reason that he was terminated was "because I was sick" and "because of me being injured and taking FMLA leave."

ECF No. 20-4 at 37. "I really think that's the case because I didn't have an issue before I got hurt," Plaintiff further stated. ECF No. 20-42 at 37. Plaintiff conceded that aside from the days off in January 2018 for which he was disciplined, all of his requests for FMLA leave were granted and approved. *Id.* at 38. Plaintiff also testified that neither Mannon nor Sessa had anything to do with his FMLA leave requests and that Aetna, which administered FMLA leave for Defendants, along with Defendants' human resources department, approved or disapproved such requests. *Id.* at 27–28, 38; *see also* ECF No. 20-2 at 6 (establishing Defendants' FMLA policies and providing that employees must contact Aetna before requesting leave).

Plaintiff also testified that he believed Defendants had violated their progressive discipline policy in terminating him because, to his knowledge, the policy only allowed prior disciplinary actions within the past year to be considered in determining punishment for a new incident. ECF No. 20-4 at 42. The policy, which is an exhibit to Defendants' Motion, establishes four steps of discipline: verbal warnings, written reprimands, a final written warning and reprimand or suspension, and termination. ECF No. 20-3 at 4. It further provides that "[a]s a rule of thumb, if an employee goes a year of employment without a disciplinable incident it is likely that the level of discipline will be repeated rather than moving to the next step." *Id.* at 5.

Notably, the introductory section of the policy, titled "Purpose," states that "[i]t is essential to recognize that there are some issues/incidents that are so serious that progressive discipline is not appropriate and more severe disciplinary steps, including discharge are warranted even on the first incident." *Id.* at 2. Another section provides that "[v]arying degrees of discipline may be applied depending on the nature, severity and/or previous incidents of behavior." *Id.* at 3. A section titled "Statement of Policy" further states that "[a]ny violation may be subject to termination at the first offense depending on several variables (i.e.: situation,

severity of the offense, employee record & length of service and current documentation on file)." *Id.* In his deposition, Plaintiff agreed that the existence of this multi-step discipline policy does not entail that punishment for certain offenses will always start at the verbal or written warning stage and that it will depend on the circumstances of the incident. ECF No. 20-4 at 43.

Plaintiff filed his Complaint against Defendants on September 26, 2018. ECF No. 1. Defendants filed an Answer on November 8, 2018, ECF No. 7, and Plaintiff filed a consent motion for leave to file an Amended Complaint, along with the proposed Amended Complaint, on March 4, 2019, ECF Nos. 14, 15. On July 1, 2019, Defendants filed a Motion for Summary Judgment, ECF No. 19, and filed an amended motion the same day, ECF No. 20. Plaintiff filed an Opposition on August 16, 2019, ECF No. 26, and Defendants submitted a Reply on August 30, 2019, ECF No. 27. Separately, Plaintiff filed a Charge of Discrimination with the Maryland Commission on Civil Rights on November 8, 2018. ECF No. 20-24. Citing incidents also at issue in this litigation, the Charge alleged that Plaintiff was discriminated against because of his disability and injuries, his race, and in retaliation for opposing discrimination. *Id.* at 2. The parties have not informed the Court of the status of the matter before the Commission.

## II.    STANDARD OF REVIEW

Summary judgment is proper if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986) (citing Fed. R. Civ. P. 56(c)); *Francis v. Booz, Allen & Hamilton, Inc.*, 452 F.3d 299, 302 (4th Cir. 2006). A material fact is one "that might affect the outcome of the suit under the governing law." *Spriggs v. Diamond Auto Glass*, 242 F.3d 179, 183 (4th Cir. 2001) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute of material fact is only "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving

party." *Anderson*, 477 U.S. at 248–49. However, the nonmoving party "cannot create a genuine issue of material fact through mere speculation or the building of one inference upon another." *Beale v. Hardy*, 769 F.2d 213, 214 (4th Cir. 1985). The Court may rely on only facts supported in the record, not simply assertions in the pleadings, in order to fulfill its "affirmative obligation . . . to prevent 'factually unsupported claims or defenses' from proceeding to trial." *Felty v. Graves-Humphreys Co.*, 818 F.2d 1126, 1128 (4th Cir. 1987) (quoting *Celotex*, 477 U.S. at 323–24). When ruling on a motion for summary judgment, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson*, 477 U.S. at 255.

## III. DISCUSSION

Plaintiff's Amended Complaint alleges claims of unlawful interference with his right to leave under FMLA and unlawful retaliation for taking such leave. ECF No. 15 ¶¶ 27–71. Because no reasonable factfinder could return a verdict in Plaintiff's favor, even construing the facts in the light most favorable to him, the Court will grant summary judgment to Defendants on both claims.

### A. FMLA Interference

"The FMLA entitles eligible employees to take twelve weeks of leave during any twelve-month period for a 'serious health condition that makes the employee unable to perform the functions' of his job." *Vannoy v. Fed. Reserve Bank of Richmond*, 827 F.3d 296, 301 (4th Cir. 2016) (quoting 29 U.S.C. § 2612(a)(1)(D)). "Following this leave period, an employee has the right to reinstatement to his or her original position or an equivalent post." *Id.* (citing 29 U.S.C. § 2614(a)(1)). An equivalent position must have "equivalent employment benefits, pay, and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(B). It is "unlawful for any employer to interfere with, restrain, or deny the exercise of or the attempt to exercise, any right

provided" by FMLA. *Id.* § 2615(a)(1). The statute provides a private cause of action to a plaintiff alleging a violation of § 2615. *Id.* § 2617(a)(2); *see Ragsdale v. Wolverine World Wide, Inc.*, 535 U.S. 81, 89 (2002).

"'To establish unlawful interference with an entitlement to FMLA benefits,' a plaintiff must prove that (1) she was an eligible employee; (2) her employer was a covered employer; (3) she was entitled to leave under the FMLA; (4) she gave her employer adequate notice of her intention to take leave; (5) the employer denied her FMLA benefits to which she was entitled; and (6) the violation prejudiced her in some way." *Smith v. Caesars Baltimore Mgmt. Co., L.L.C.*, Civil No. ELH-17-3014, 2019 WL 3766529, at *11 (D. Md. Aug. 9, 2019) (quoting *Sherif v. Univ. of Md. Med. Ctr.*, 127 F. Supp. 3d 470, 477 (D. Md. 2015)). "Such prejudice can be proven by showing that the employee lost compensation or benefits 'by reason of the violation,' [29 U.S.C.] § 2617(a)(1)(A)(i)(I); sustains other monetary losses 'as a direct result of the violation,' *id.* § 2617(a)(1)(A)(i)(II); or suffers some loss in employment status remediable through 'appropriate' equitable relief, such as employment, reinstatement, or promotion, *id.* § 2617(a)(1)(B)." *Anderson v. Discovery Commc'ns, LLC*, 517 F. App'x 190, 198 (4th Cir. 2013).

Plaintiff's Amended Complaint alleges that Defendants interfered with his FMLA rights in three ways: by failing to reinstate him to a substantially equivalent position when he returned from one of his first periods of leave in early April 2016; by "chang[ing] the essential functions of [his] job from Delivery Expediter to Plant Operator"; and by denying him "equivalent pay when they denied his annual salary increase of $0.65 per hour." ECF No. 15 ¶¶ 53–55. These claims lack merit. First, "the FMLA provides no absolute right to restoration to a prior employment position," nor does it "require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave." *Yashenko v. Harrah's*

*NC Casino Co., LLC*, 446 F.3d 541, 547 (4th Cir. 2006) (citing 29 C.F.R. § 825.216). "[A]n employer can avoid liability under the FMLA if it can prove that it 'would not have retained an employee had the employee not been on FMLA leave.'" *Id.* (quoting *Throneberry v. McGehee Desha Cty. Hosp.*, 403 F.3d 972, 977 (8th Cir. 2005)).

Here, Collins' affidavit and her September 2017 letter to Plaintiff state that Plaintiff's position as delivery expediter was one of several positions that were eliminated after having become redundant as a result of Defendants' merger in July 2015. ECF No. 20-5 ¶ 4; ECF No. 20-9 at 6. Plaintiff offers no evidence to create a genuine dispute of fact about the truth of that explanation. When asked at his deposition if he was aware of an ulterior motive or other reason that his position was eliminated, Plaintiff declined to speculate and simply responded "I don't know why they eliminated my position." *Id.* at 7. And he has offered no other testimony or evidence that could lead a factfinder to disbelieve Collins' account.[7]

At summary judgment, "[t]he burden is on the nonmoving party to show that there is a genuine issue of material fact for trial." *Guessous v. Fairview Prop. Invs., LLC*, 828 F.3d 208, 216 (4th Cir. 2016) (citing *Anderson*, 477 U.S. at 248–49). Plaintiff has failed to raise a genuine dispute about whether Defendants would have retained him in that position if he had not taken leave. Accordingly, summary judgment is appropriate with respect to this element of Plaintiff's interference claim. Summary judgment is also warranted as to Plaintiff's similar allegation that Defendants interfered with his FMLA rights by "chang[ing] the essential functions of [his] job from Delivery Expediter to Plant Operator." ECF No. 15 ¶ 54. As Defendants argue correctly, because they had no duty to reinstate Plaintiff to a position they eliminated for reasons unrelated

---

[7] For example, Plaintiff has provided no evidence that the other delivery expediter position was not eliminated when his was.

to FMLA leave, they had no duty to ensure that any new position they offered to him to replace the eliminated role had comparable duties and responsibilities.

The same reasoning applies once again to Plaintiff's claim that he was unlawfully denied a pay increase. Collins' explanation that Plaintiff's expected increase was "entirely discretionary and not guaranteed, regardless of whether his position was eliminated or whether he was out on leave." ECF No. 20-5 ¶ 11. Collins further explained that Plaintiff's pay rate in his new position "was already in alignment with, and in some cases higher than, that of other employees in the same position, so we did not find it necessary to increase his salary." *Id.* ¶ 12. To be sure, Plaintiff testified that he believed other plant operators received raises and that he was not paid more than other batcher/plant operators at his existing rate. ECF No. 20-4 at 9–10. But regardless of whether Plaintiff's beliefs were correct, that evidence does not raise a genuine dispute about whether pay raises were discretionary. Moreover, because Plaintiff had no right to reinstatement, he has no basis on which to claim entitlement to greater pay in a new position, even if annual increases were mandatory for his prior position. Summary judgment is therefore appropriate on all aspects of Plaintiff's FMLA interference claim.

### B.    FMLA Retaliation

Plaintiff additionally claims that Defendants unlawfully retaliated against him for taking FMLA leave. 29 U.S.C. § 2615(a)(2) provides that an employer may not "discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this subchapter." Unlike with FMLA interference claims, "employer intent here is relevant." *Sharif v. United Airlines, Inc.*, 841 F.3d 199, 203 (4th Cir. 2016); *see also Sherif*, 127 F. Supp. 3d at 477 (explaining that "the retaliation claim requires proof of retaliatory intent"). "Intent can be established either by direct evidence of retaliation or through the familiar burden shifting

framework articulated in *McDonnell Douglas Corp. v. Green*." *Sharif*, 841 F.3d at 203 (citation omitted).

Under the *McDonnell Douglas* framework, "a plaintiff must first produce sufficient evidence to establish a prima facie case that the elements of retaliation are satisfied. The burden of production then shifts to the employer to rebut the prima facie presumption of retaliation and provide 'some legitimate, nondiscriminatory reason' for the adverse employment action." *Id.* (citations omitted) (quoting *McDonnell Douglas*, 411 U.S. at 802). "If the employer meets this burden, the presumption of retaliation is dissolved and the plaintiff resumes the burden of persuading the factfinder that the employer's proffered explanation is merely a pretext for discrimination. A plaintiff may satisfy this burden by showing either that the employer's explanation is not credible, or that the employer's decision was more likely the result of retaliation. In any event, the plaintiff must produce sufficient evidence to create a genuine dispute of material fact such that a reasonable factfinder could conclude the adverse employment action was taken for an impermissible reason, i.e., retaliation." *Id.* (citations omitted).

To establish a prima facie case of retaliation and satisfy the first step of the *McDonnell Douglas* framework, a plaintiff must show "that he engaged in protected activity, that the employer took adverse action against him, and that the adverse action was causally connected to the plaintiff's protected activity.'" *Yashenko*, 446 F.3d at 551 (quoting *Cline v. Wal–Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998)). Taking FMLA leave is a protected activity. *Id.* "Adverse action" is a category that "'extends beyond workplace-related or employment-related retaliatory acts and harm' because '[a]n employer can effectively retaliate against an employee by taking actions not directly related to his employment or by causing him harm *outside* the workplace.'" *Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018) (alterations and

emphasis in original) (quoting *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 63 (2006)); *see also id.* at 327 n.3. "Accordingly, retaliatory actions need not 'affect the terms and conditions of employment,'" but they "do have to be 'materially adverse'—such that they 'might have dissuaded a reasonable worker' from engaging in protected activity." *Id.* (quoting *Burlington N.*, 548 U.S. at 68).

Plaintiff's Amended Complaint makes four specific allegations of Defendants' actions and behavior that he claims constitute retaliation: failure to give him equivalent terms and conditions of employment when he returned from FMLA leave in 2016 and his hours "increased from 47 to 74 hours per week"; hostile behavior by Mannon in April 2018 after Plaintiff returned from another period of FMLA leave; Plaintiff's suspension on July 24, 2018; and his termination on August 15, 2018. ECF No. 15 ¶¶ 56–59.[8]

Defendants first argue that Plaintiff has failed to establish a prima facie case as to the issues of his work hours, Mannon's alleged hostile behavior, and Plaintiff's suspension because none constitute "an adverse employment action." ECF No. 20 at 30. However, as the Fourth Circuit explained in *Strothers v. City of Laurel*, retaliatory actions "need not 'affect the terms and conditions of employment' to come within Title VII's prohibition" on retaliation, 895 F.3d at 327 (citing *Burlington N.*, 548 U.S. at 64).[9] "[A]dverse action" rather than "adverse employment action" is the proper standard "because the adverse action need not be employment- or workplace-related in order to sustain a retaliation claim." *Strothers*, 895 F.3d at 327 n.3.

---

[8] In the portions of his Opposition that discuss retaliation, Plaintiff largely focuses on providing his own account of these incidents and discrediting Defendants' account. He does not address his burden to make out a prima facie case of retaliation. Nonetheless, the Court reads components of Plaintiff's brief that discuss the topics raised by Defendants' Motion as arguments in opposition.

[9] In evaluating FMLA retaliation claims, courts look to caselaw evaluating Title VII retaliation. *Yashenko*, 446 F.3d at 550–51 (citing *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001)).

Nonetheless, Plaintiff has failed to establish a prima facie case with respect to his increase in work hours in 2016. As an initial note, it bears mention that this claim – which asserts that Defendants retaliated against Plaintiff by offering him a position with greater hours and responsibility after his prior position was eliminated – is essentially just a repackaging of Plaintiff's claim of interference through failure to reinstate, which the Court has already rejected. Even treating it as a standalone claim, however, it has little merit. Plaintiff testified that he worked approximately 60 hours per week in his first role as a driver, 45 to 55 hours per week as a delivery expediter, 60 to 80 hours per week as a batcher/plant operator, and 45 hours per week as a driver at the Jessup plant. ECF No. 20-4 at 10, 40, 41. This testimony shows that Plaintiff's hours increased and decreased consistent with the varying duties of the positions that he held, which heavily undermines the inference of causation needed for a prima facie case.

Further, even if Plaintiff had established a prima facie case concerning his work hours, his claim would fail because Defendants have articulated a legitimate, nondiscriminatory explanation – that the batcher/plant operator position simply required more work – and Plaintiff has failed to offer sufficient evidence of pretext. To be sure, Plaintiff testified at his deposition that he believed he was given more work than batcher/plant operators at other plants, whom he asserted shared the duties that he performed among two to three workers. *Id.* at 10–12. When asked if he had reason to believe that Defendants were intentionally not providing him with help, however, Plaintiff responded "I don't know." *Id.* at 12. Though he speculated that "it seemed to be that way," Plaintiff's speculation alone, without any corroboration in the record indicative of pretext, is insufficient to create a genuine dispute of material fact. With no additional evidence supporting this claim, summary judgment is appropriate.

Defendants next argue that Plaintiff fails to make out a prima facie case with respect to Mannon's allegedly hostile behavior to Plaintiff. In response, Plaintiff simply recounts the specific incidents of Mannon's behavior toward him that he believes were hostile. These include Mannon's use of the word "'Coons' in a derogatory manner'" on April 6, 2018; Mannon sending Plaintiff home early on April 9, 2018; Mannon telling another driver that he hoped Plaintiff did not return from vacation later in April 2018; and Mannon's April 29, 2018 text message to Plaintiff accusing him of "asinine" behavior and "skulduggery" [sic]. ECF No. 26 at 12. Plaintiff characterizes this behavior as "unfair treatment," but makes no legal argument and cites no grounds to establish that it forms a prima facie case of FMLA retaliation. *Id.* Most notably, Plaintiff does not demonstrate how the comments and actions were causally linked to any of his requests for FMLA leave, over which he admitted Mannon had no control. ECF No. 20-4 at 38.

Nor does Plaintiff demonstrate how Mannon's behavior was "materially adverse," which requires a showing that the conduct "'might have dissuaded a reasonable worker' from engaging in protected activity." *Strothers*, 895 F.3d at 327 (quoting *Burlington N.*, 548 U.S. at 68). To be clear, Mannon's undisputed use of a derogatory racial epithet in Plaintiff's presence, even though the record indicates that he was not directing it at Plaintiff, is not to be taken lightly. But it speaks little to Defendants' intent to retaliate against Plaintiff for taking FMLA leave, which is what Plaintiff has the burden to demonstrate in this case. Notably, the Charge of Discrimination that Plaintiff filed with the Maryland Commission on Civil Rights on November 8, 2018, which cites the comment among other incidents, alleges discrimination on the basis of Plaintiff's race and disability, not as a response to taking protected leave. ECF No. 20-24. While Plaintiff correctly notes that discrimination can simultaneously take different forms, that he essentially

makes no other argument on this issue strengthens the conclusion that a FMLA retaliation claim is not the proper means for addressing his alleged unfair treatment by Mannon in April 2018.

Defendants next seek summary judgment with respect to Plaintiff's suspension on July 24, 2018. Defendants primarily argue that there was a legitimate, nondiscriminatory reason for the action, namely that a discrepancy was observed between the injury Plaintiff had reported and the injury for which his FMLA leave had been approved. Defendants' position matches the materials in the record. In responses to Plaintiff's interrogatories, Defendants explained that Plaintiff was suspended "pending an investigation into discrepancies regarding his report of a workplace injury and subsequent need for FMLA." ECF No. 20-18 at 3. Plaintiff testified that he was not told the reason for the suspension at the time and stated in his subsequent affidavit that he first learned of the reason from the interrogatory responses. ECF No. 20-4 at 41–42, ECF No. 26-2 ¶¶ 1–4. He also testified that upon his return to work he was paid for the days for which he was suspended. ECF No. 20-4 at 42.

Aside from this testimony, Plaintiff has offered no evidence that even addresses the suspension, let alone that challenges or casts doubt on Defendants' account of the reasons for it. Instead, he simply alleges in his brief that the suspension was a "bogus charge" raised "merely to retaliate against [his] use of FMLA leave" and that Defendants used it "to simulate adherence with [their] progressive discipline policy." ECF No. 26 at 10, 12. Without any supporting materials in the record, however, these allegations bear no weight and do little to demonstrate that Defendants' legitimate, nondiscriminatory reason was pretextual. "[A] party cannot withstand summary judgment by relying solely on his own self-serving allegations unsupported by any corroborating evidence." *Pronin v. Johnson*, 628 F. App'x 160, 161 (4th Cir. 2015) (per

curiam) (citing *Williams v. Giant Food Inc.*, 370 F.3d 423, 433 (4th Cir. 2004)). Accordingly, summary judgment is appropriate for Defendants with respect to the suspension.

Finally, Defendants argue on several grounds that Plaintiff's termination was lawful and justified. Defendants focus primarily on the reason for the discharge that Collins gave in her termination letter: "you exhibited insubordinate and unprofessional behavior towards your Supervisor on August 14, 2018, following repeated verbal and written warnings regarding this kind of behavior." ECF No. 20-22 at 2. This explanation for Plaintiff's discharge is facially legitimate and nondiscriminatory. Plaintiff's remark to Mannon that Mannon could come drive Plaintiff's truck, which Plaintiff does not deny making even as he quibbles with his exact wording, ECF No. 20-4 at 34, was part of a series of insubordinate actions and statements by Plaintiff, accompanied by other performance issues, that the parties have extensively described and which the Court has related at length here.

Plaintiff spends the great majority of his Opposition brief contextualizing and relaying his own account of several of these incidents and issues. These include Plaintiff's various unsuccessful attempts to be transferred to the Rockville facility, his July 24, 2017 emails with Brandon Echard about issues with the malfunctioning silo, his text messages with Pepple before he returned to work on August 6, 2017, his various complaints and overheard comments while on restricted duty in Greenbelt, his mistakes entering purchase orders in October 2017, his warning for excessive absences in February 2018, the incident with Mannon's racial remark in April 2018, his text messages to Mannon and Mannon's supervisor at the end of that month, the issues he raised in his complaint on May 3, 2018, his suspension in May 2018, and finally his remark to Mannon that precipitated his termination.

Plaintiff asserts that Defendants' responses to these acts were motivated by an intent to retaliate against him for taking FMLA leave and for protesting unfair treatment. At his deposition, however, Plaintiff offered little more than unsupported speculation that Defendants' actions were based in retaliatory animus. Instead, he denied that some of the incidents took place and attempted to explain and excuse the remainder as justified or understandable because he was "mad" or because the circumstances were "frustrating." ECF No. 26-1 at 3; ECF No. 20-4 at 22–23. Importantly, whether these incidents individually or collectively merited Plaintiff's termination is not a matter for the Court, which does not "sit 'as a kind of super-personnel department weighing the prudence of employment decisions.'" *Villa v. CavaMezze Grill, LLC*, 858 F.3d 896, 901 (4th Cir. 2017) (quoting *DeJarnette v. Corning Inc.*, 133 F.3d 293, 299 (4th Cir. 1998)). "[W]hen an employer gives a legitimate, nondiscriminatory reason for discharging the plaintiff, it is not [the Court's] province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Laing v. Fed. Express Corp.*, 703 F.3d 713, 722 (4th Cir. 2013) (first alteration in original) (quoting *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000)).

Because Defendants have offered a legitimate, nondiscriminatory reason for Plaintiff's discharge, Plaintiff must offer sufficient evidence for a reasonable factfinder to conclude that Defendants' reason was a pretext for unlawful retaliation. He has not done so here. In fact, Plaintiff makes no explicit argument with respect to pretext at all, though he makes the somewhat responsive factual assertions that Defendants ignored Mannon's unprofessional conduct toward Plaintiff and violated their progressive discipline policy in terminating him. To the extent that the first assertion has any bearing on the pretext inquiry, it is unsupported by the evidence in the record. Collins' June 1, 2018 response to Plaintiff's complaint about Mannon's

racial comments states that Defendants conducted an investigation and interviewed Mannon and King before closing the matter. ECF No. 20-19 at 2. Collins further explained that Mannon's text message characterizing Plaintiff's outreach as "asinine or skullduggery" was unprofessional and that Mannon had consequently been warned about his behavior. *Id.*

Plaintiff's arguments concerning the discipline policy fare no better. Plaintiff claims that Defendants violated the policy in terminating him by considering conduct that took place more than one year prior to his termination and by proceeding directly to termination without first applying less punitive steps. ECF No. 26 at 11–12. Both arguments are directly refuted by the text of the policy. The purported one-year limitation, for which Plaintiff provides no citation, appears to derive from the policy's statement that "[a]s a rule of thumb, if an employee goes a year of employment without a disciplinable incident it is likely that the level of discipline will be repeated rather than moving to the next step." ECF No. 20-3 at 5. That "rule of thumb" plainly does not prohibit Defendants from considering issues from any point in an employee's tenure when determining appropriate discipline for a new incident. Further, the record reflects, and Plaintiff's testimony confirms, that Plaintiff received several letters and other reprimands through his tenure with Defendants before he was eventually terminated.

Nor does the policy require Defendants to apply less punitive steps before termination. In fact, the provisions that the Court noted previously underscore that no such requirement exists. One states that "[i]t is essential to recognize that there are some issues/incidents that are so serious that progressive discipline is not appropriate and more severe disciplinary steps, including discharge are warranted even on the first incident." *Id.* at 2. Another makes clear that "[a]ny violation may be subject to termination at the first offense depending on several variables." *Id.* at 3. And a third states that "[v]arying degrees of discipline may be applied

depending on the nature, severity and/or previous incidents of behavior." *Id.* In light of these provisions, application of which the Court will not second-guess, Plaintiff lacks any basis in the policy to claim that Defendants' proffered reason for his termination was pretextual.

Nor has Plaintiff provided any other indications of pretext. As Defendants note, Plaintiff has conspicuously failed to provide any evidence of how other employees in similar circumstances were treated beyond a small number of unsubstantiated claims in his deposition that he did not raise in his briefing. As an example, if Plaintiff had provided evidence for his claim that other employees made remarks to Mannon similar to Plaintiff's but suffered no discipline, that could perhaps support an inference that Plaintiff was singled out improperly or unlawfully. But no such evidence appears in the record, and Plaintiff "cannot withstand summary judgment by relying solely on his own self-serving allegations unsupported by any corroborating evidence." *Pronin*, 628 F. App'x at 161. Therefore, because Plaintiff has failed to meet his burden of demonstrating that Defendants' reason for his termination was pretextual, the Court will grant summary judgment for Defendants on Plaintiff's retaliation claim.

## IV.    CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment, ECF No. 20, will be granted. A separate Order shall issue.


Date: <u>March 20, 2020</u>                                    /s/_____
                                                               GEORGE J. HAZEL
                                                               United States District Judge